**JUDGE REARDEN**

23 CV 04741

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **FILED UNDER SEAL** |
| Plaintiffs, | Case No. ____-cv-_____ |
| vs. | Pursuant to 31 U.S.C. § 3730 |
| ALPHAPOINT CORPORATION and GALAXY DIGITAL HOLDINGS LIMITED, | (False Claims Act) |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

1.      Plaintiff-Relator Bitcoins Norge AS ("BNAS"), by and through its attorneys at Kelman PLLC, brings this False Claims Act Complaint on behalf of the United States of America against Defendants AlphaPoint Corporation ("AlphaPoint") and Galaxy Digital Holdings Limited ("Galaxy"). All facts alleged herein are based upon the personal knowledge of the Relator.

## NATURE OF THE CASE

2.      This is a claim to recover damages and civil penalties on behalf of the United States of America arising from false statements and false claims made by AlphaPoint and Galaxy to qualify for loans under the Paycheck Protection Program ("PPP").

3.      The PPP was enacted as part of the CARES Act in 2020 to provide extraordinary relief for American small businesses in response to the COVID-19 pandemic. Like other relief programs operated by the Small Business Administration (the "SBA"), PPP loans were exclusively for small businesses. Private equity firms like Galaxy and their portfolio companies were *expressly ineligible* for PPP loans.

1

4.    AlphaPoint — one of Galaxy's portfolio companies — applied for and received two separate PPP loan disbursements totaling $3,663,628.00. Both were ultimately forgiven, but neither had been necessary. AlphaPoint had received a $5.6 million equity injection from Galaxy just one month prior to their 2020 PPP loan application. And by 2021, the digital asset market was in the midst of an incredible bull run that generated record profits for Galaxy and saw AlphaPoint named by the Financial Times[1] as one of the 50 fastest-growing companies in America.

5.    AlphaPoint and Galaxy sought to conceal Galaxy's control over AlphaPoint from the United States through a voting agreement that temporarily removed Galaxy's control over AlphaPoint's board while the PPP loans were outstanding. Pursuant to the scheme, Galaxy's control would automatically resume once the PPP loans were forgiven.

6.    On information and belief, this voting agreement was not prepared until January 2023, after the parties realized that they faced liability due to AlphaPoint's affiliation with Galaxy, and had been backdated to make it appear as though it was entered into prior to any PPP loan applications.

7.    Accordingly, AlphaPoint and Galaxy acted to defraud the United States of America in violation of the False Claims Act, 31 U.S.C. §§ 3729-32. Since its enactment, the False Claims Act ("FCA") has been substantially amended by Congress to enhance the federal government's ability to recover losses sustained as a result of fraud.

8.    Congress sought to encourage private individuals who were aware of such fraud to report it to appropriate authorities by offering monetary rewards in conjunction with protection from reprisal, government investigation, and prosecution.

---

[1] https://www.ft.com/americas-fastest-growing-companies-2021

9.     The FCA allows any "person," including corporate entities, having knowledge of a false or fraudulent claim against the government to bring an action in federal district court for both itself and for the United States of America and to share in any recovery from such action.

10.    The complaint must be filed under seal for 60 days while the government conducts an investigation and determines whether to join the suit. Service must not be made on the defendant during this 60-day period so the investigation can take place without the Defendant's knowledge.

11.    Upon filing the complaint, the relator-plaintiff must soon thereafter disclose all material evidence and information supporting the complaint in a statement filed with the Attorney General of the United States.

12.    The FCA holds any person who knowingly causes a false claim to be submitted to the government liable for a civil penalty of between $5,500 and $11,000 per claim, plus three times the amount of damages the government sustained. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

13.    Under the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at §(b). The FCA is clear that "no proof of specific intent to defraud is required" for a successful claim. *Id.*

14.    As further detailed below, Defendants knowingly submitted, caused to be submitted, or facilitated the submission of false and fraudulent documents, and made false and fraudulent representations and/or omissions, to the federal government in order to obtain PPP loans.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345, and 31 U.S.C. § 3732.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) & (c), and 31 U.S.C. § 3732, because Defendants are both headquartered in New York City and regularly conduct business in New York.

## PARTIES

17.     Relator BNAS is a Norwegian aksjeselskap (stock-company) headquartered in Norway.  BNAS operates a digital asset exchange for Norwegian customers that was previously a customer of AlphaPoint.  In 2022, BNAS received warrants to purchase AlphaPoint common stock as part of a settlement agreement with AlphaPoint, which caused AlphaPoint to disclose certain information to BNAS that gave rise to this action.

18.     Plaintiff, the United States of America, passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") that created and funded the PPP loans to be administered by the SBA to help businesses keep their workforces employed during the COVID-19 crisis.

19.     Defendant AlphaPoint operates a platform for digital asset exchanges and brokerages. AlphaPoint is incorporated in Delaware—with its registered agent located at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801—but is headquartered in New York City, with its office at 228 Park Ave S, Suite 75687, New York, NY 10003-1502.

20.     Defendant Galaxy is a hedge fund that specializes in investing in the digital asset ecosystem. Galaxy is incorporated in the Cayman Islands, but headquartered in New York City, with its office at 300 Vesey Street, New York, NY 10282. Galaxy also maintains multiple

international and regional offices including, but not limited to, Chicago, San Francisco, and New Jersey.

## BACKGROUND

### Relator BNAS Uncovers Galaxy and AlphaPoint's Scheme

21.    On or about February 4, 2020, Relator BNAS and AlphaPoint entered into a settlement agreement to resolve certain losses AlphaPoint had caused to BNAS' business (the "Settlement Agreement").  AlphaPoint held digital assets in custody for BNAS as part of their service agreement and had lost those digital assets after their systems were penetrated and looted by hackers.

22.    The Settlement Agreement required AlphaPoint to make monthly payments to BNAS beginning in February 2020 and ending in August 2022.  AlphaPoint was also required to provide BNAS with warrants to purchase common shares in AlphaPoint, which could be repurchased by AlphaPoint at the end of the Settlement Agreement's term in a final balloon payment.

23.    When the Settlement Agreement's term ended, AlphaPoint opted to permit BNAS to keep the warrants by allowing the term to lapse without making the final balloon payment. Unbeknownst to BNAS, however, exercising its newly received warrants was about to become contentious.

24.    AlphaPoint had accepted millions of dollars in PPP loans that it was in fact *ineligible* to receive due to affiliation with its largest shareholder, Galaxy.  In October 2022, Congress held hearings on PPP fraud in the Fintech industry, which on information and belief, caused AlphaPoint to become concerned that it may face liability for the PPP loans it had received.

25.    On October 13, 2022, BNAS emailed AlphaPoint requesting (1) to exercise its warrants to receive AlphaPoint shares, and (2) that AlphaPoint pay the final payment due under the Settlement Agreement.  After weeks of back and forth, BNAS threatened legal action, which prompted AlphaPoint to finally provide BNAS with a warrant agreement (the "Warrant Agreement") and tender the final payment due under the Settlement Agreement.

26.    On November 9, 2022, BNAS signed and returned the Warrant Agreement to AlphaPoint, and paid the $360.14 fee to exercise the warrants.  By this point, to receive its AlphaPoint shares, BNAS needed only to sign certain "standard form" stock restriction and investor right agreements (the "Restrictions") described in section 2(c) of the Warrant Agreement.

27.    However, section 2(c) could obligate BNAS to sign the Restrictions *only if* the other shareholders had likewise signed them — *e.g.* "provided such stockholder and/or investor rights agreements are the standard forms of agreement executed by the Company's other holders of Common Stock."

28.    On December 3, 2022, AlphaPoint demanded BNAS execute a confidentiality agreement, despite such agreement *not* having been signed by all of AlphaPoint's holders of common stock.

29.    On December 12, however, AlphaPoint was forced to admit some of its other holders of common stock had *not* signed the confidentiality agreement they had demanded BNAS sign — *e.g.* "a majority of AlphaPoint's shareholders have done so".  BNAS then reiterated its refusal to sign and demanded a copy of the Restrictions it was required to sign so it could receive its shares without further delay.

30.     On December 19, having received no reply from AlphaPoint, BNAS emailed seeking an update, to which AlphaPoint responded: *"[w]e are in the process of drafting the documentation regarding the restrictions."*

31.     AlphaPoint's admission that the Restrictions had not yet been drafted indicated that they were not "standard forms of agreement" and that they had not been "executed by the Company's other holders of Common stock" as required by the Warrant Agreement.

32.     On January 13, 2023, AlphaPoint finally sent BNAS the Restrictions for execution.  However, the Restrictions had been redacted.  AlphaPoint informed BNAS that they would need to enter into a confidentiality agreement in order to obtain unredacted versions since they were "confidential".

33.     Collectively, these documents are hereinafter referred to as the "Redacted AlphaPoint Documents":

    a.  AlphaPoints's amended and restated bylaws (the "Restated Bylaws");

    b.  AlphaPoint's voting rights agreement, which was signed concurrently with the Restated Certificate in 2018 (the "2018 Voting Rights Agreement");

    c.  an amended voting rights agreement, which was entered into in 2020 (the "2020 Amended Voting Agreement").

34.     Relator sent the Redacted AlphaPoint Documents to its attorneys to obtain their opinion. Relator's attorneys analyzed the Redacted AlphaPoint Documents and advised Relator as to a number of issues.

35.     *First,* the Redacted AlphaPoint documents concerned certain voting arrangements that governed how the members of AlphaPoint's board of directors were to be selected and who would get to select them.  AlphaPoint apparently wanted to ensure that this process remained confidential.

36.    *Second,* the 2018 Voting Rights Agreement was improperly redacted and its redacted language remained visible.  The redacted language that remained visible made clear that Galaxy possessed immense control over AlphaPoint's board of directors and was able to control the selection of a majority of its seats.  AlphaPoint apparently wanted to ensure that Galaxy's control remained confidential.

37.    *Third,* unlike the 2018 Voting Rights Agreement, the redactions in the 2020 Amended Voting Agreement were properly affixed and could not be read.  However, it was clear what those redactions said because the redacted names were found in the language that was identical to that of the 2018 Voting Rights Agreement, and the redactions were of equal size.  It was therefore clear which redacted words in the 2020 Amended Voting Agreement read "Galaxy".

38.    *Fourth,* the 2020 Amended Voting Agreement's recitals indicated that its express purpose was to enable AlphaPoint to apply for a PPP loan.    The 2020 Amended Voting Agreement temporarily *removed* Galaxy's ability to control the selection of a majority of AlphaPoint's board seats, and with it, its control over AlphaPoint.  This appeared to be an effort to avoid the SBA's affiliation rules that would have deemed AlphaPoint to be Galaxy and thereby prevented it from being eligible for PPP loan money that was intended solely for small businesses.  However, the change in control was only temporary, and Galaxy's control would automatically resume once the PPP loans were forgiven or repaid.

39.    *Fifth,* the metadata in the 2020 Amended Voting Agreement (which had been sent as a PDF) indicated that it had a creation date of 10 January 2023, just two days before the documents were sent to Relator.  Conversely, the metadata in both the 2018 Voting Rights

Agreement and the Restated Bylaws (which were also sent as PDFs) had a creation date in 2018, indicating that they were originals.

40.    These discrepancies in the metadata indicated that the 2020 Amended Voting Agreement had been recently created and was backdated.  This conclusion was bolstered by AlphaPoint's December 19 email, which stated that *"[w]e are in the process of drafting the documentation regarding the restrictions."*

41.    Accordingly, because AlphaPoint applied for and received millions of dollars in PPP loans that were ultimately forgiven or may be forgiven in the future, BNAS brings the instant action against AlphaPoint and Galaxy under the False Claims Act — private equity firms and their portfolio companies are *ineligible* for PPP funds.

## The False Claims Act

42.    The False Claims Act ("FCA") holds any person who presents, or causes, a false claim to be submitted, to the Government liable for a civil penalty of between $5,500 and $11,000 per claim, plus three times the amount of damages the Government sustained. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

43.    Under the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b). "[N]o proof of specific intent to defraud is required" for a successful claim. *Id.*

## The Payroll Protection Program

44.    The PPP is a loan program that originated from the CARES Act as a response to the COVID-19 crisis. The program is implemented by the SBA with support from the Department of the Treasury.

45.    The program intended to provide temporary financial assistance to small businesses, meaning those with 500 or fewer employees. 15 USC § 636(a)(36)(D). Certain businesses with more than 500 employees are eligible in certain industries. *Id.*

46.    Section 1106 of the CARES Act provided for the forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP if borrowers complied with certain restrictions on the use of the funds.

47.    In applying for PPP loans, businesses were required to make several certifications, including certifications regarding eligibility for the PPP loan, the need for the loan funds, the accuracy and truthfulness of the information submitted with the loan application, and the use of funds.[2]

48.    The SBA promulgated regulations to implement the PPP loan program, which were published in the Federal Register on April 28, 2020, to clarify that hedge funds and private equity firms were *ineligible* to receive a PPP loan.

49.    These types of businesses were already generally ineligible for section 7(a) small business loans under existing SBA regulations due to the nature of their business activities in investment or speculation. *See* 85 Fed. Reg. 23450.  The SBA accordingly sought to ensure that the same standards applied to the PPP loan program.

50.    To prevent this rule from being circumvented, the SBA required borrowers seeking PPP funds to apply the SBA's affiliation rules (*see* 13 C.F.R. § 121.301(f)), as set forth in the Second PPP Interim Final Rule. *See* 85 Fed. Reg. 20817.

51.    "The affiliation rules apply to private equity-owned businesses in the same manner as any other business subject to outside ownership or control." *See* 85 Fed. Reg. 23450.

---

[2] *See See* U.S. Department of Treasury, Paycheck Protection Program Loans, Frequently Asked Questions (FAQs), https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf (Last visited March 8, 2023).

52.     The SBA's affiliation test is used to determine whether applicants are in fact small businesses.  Since hedge funds and private equity do not qualify as small businesses, businesses affiliated with hedge funds and private equity firms — *e.g.* their portfolio companies —  likewise do not qualify.

53.     In determining whether affiliation exists, the SBA considers a number of factors such as ownership, management, previous relationships, and contractual relationships.  13 C.F.R. *See* § 121.103(a)(2).  The "SBA will consider the *totality of the circumstances*, and may find affiliation even though no single factor is sufficient to constitute affiliation." *See* 13 C.F.R. § 121.103(a)(5).

54.     "Concerns and entities are affiliates of each other when one controls or has the power to control the other . . . It does not matter whether control is exercised, so long as the power to control exists."  *See* 13 C.F.R. § 121.103(a)(1).

55.     "Control may be affirmative or *negative*."  *See* 13 C.F.R. § 121.103(a)(3). Negative control includes instances in which "a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *Id.*

56.     In addition to applying any applicable affiliation rules, borrowers must certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

57.     Borrowers must make this certification in good faith and take into consideration their current business activity and their ability to access other sources of liquidity to support their ongoing operations that would not create a significant detriment to the business.[3]

---

[3] *See* U.S. Department of Treasury, Paycheck Protection Program Loans, Frequently Asked Questions (FAQs) Number 31,

58.    As discussed herein, just one month prior to seeking the first of its two PPP loans, AlphaPoint received in excess of $5 million in funding from Galaxy.

59.    Lastly, to discourage fraud and abuse of PPP funds, on April 28, 2020, the Department of the Treasury announced that audits would be conducted on PPP loans that exceeded $2,000,000 prior to their being forgiven.[4]  Loans of less than the two million dollar threshold would be audited "as needed" prior to being forgiven.

## FACTUAL ALLEGATIONS

### Galaxy's Negative Control over AlphaPoint

60.    In seed investment rounds between 2014 and 2016, AlphaPoint raised just over $2 million from a handful of investors.  By 2018, AlphaPoint sought to raise significantly more funds to build and grow its business.  AlphaPoint would find the financing, guidance, and mentorship they needed from a single party — Galaxy.

61.    In 2018, AlphaPoint raised $15 million from Galaxy in a Series A funding round. As part of the deal, Galaxy became a holder of AlphaPoint's Series A-1 Preferred Stock and secured for itself negative control over AlphaPoint's board of directors.

62.    To facilitate a grant of negative control to Galaxy, AlphaPoint executed an amended and restated certificate of incorporation (the "Restated Certificate").  The 2018 Voting Rights Agreement provided that "the holders of record of the shares of the Series A-1 Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Company."

___

https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf (Last visited March 8, 2023).
[4] *See* U.S. Department of Treasury, Press Releases, Joint Statement by Secretary Steven T. Mnuchin and Administrator Jovita Carranza on the Review Procedure for Paycheck Protection Program Loans, https://home.treasury.gov/news/press-releases/sm991 (Last visited March 28, 2023).

63.     Concurrent with the Restated Certificate, AlphaPoint executed the 2018 Voting Rights Agreement, which cemented Galaxy's negative control over the board by allowing it to in effect control the selection of a majority of its members.

64.     The 2018 Voting Rights Agreement required that AlphaPoint's board of directors "shall be set and remain at seven (7) directors" who were to be chosen as follows:

   a.  Galaxy chose one (1) director, the "Series A-1 Director";

   b.  AlphaPoint's common stockholders chose two (2) directors;

   c.  AlphaPoint's CEO served as a (1) director;

   d.  "Independent Directors" filled the remaining three (3) seats on the board, all of whom were subject to Galaxy's veto.

      i.  Two (2) Independent Directors were to be identified by the CEO, and required unanimous acceptance from (1) the record holders of a majority of AlphaPoint's common stock; (2) *Galaxy*; and (3) a majority of the Board.

      ii.  One (1) Independent Director was to be identified by both the record holders of the majority of AlphaPoint's common stock *and Galaxy*; it only needed to be approved by the CEO.

65.     The combined effect of the Restated Certificate and the 2018 Voting Rights Agreement was to give Galaxy control over four (4) of the board's seven (7) seats, a majority of the board:

   a.  One (1) seat was controlled directly by Galaxy — the 2018 Voting Rights Agreement appointed Greg Wasserman to the Series A-1 seat, Galaxy's then "Head of Venture";

   b.  Three (3) other board seats were to be filled by Independent Directors whom Galaxy was able to ensure were friendly to its cause with its veto power.

66.     Galaxy's influence over AlphaPoint's board was magnified by its status as AlphaPoint's largest investor.  By 2018, Galaxy had invested $15 million into AlphaPoint, dwarfing the collective $2 million investment made by the seed investors years earlier.  Galaxy had even invested in AlphaPoint at a higher valuation than its previous rounds.

67. Galaxy's influence over AlphaPoint was further magnified by AlphaPoint's need to raise additional funds in the future.  Unless and until AlphaPoint became a profitable business, it would need to raise additional funds.  And as AlphaPoint's lead investor, Galaxy's participation in an AlphaPoint funding round could ensure both a favorable valuation and the participation of additional investors who would follow Galaxy's lead.

68. Conversely, however, Galaxy's *reluctance* to invest would signal to investors that there were major problems at AlphaPoint, which would discourage both a favorable valuation and investor participation.

69. Galaxy's status as a Series A-1 preferred shareholder gave it additional influence. On information and belief, the Series A-1 preferred shares gave Galaxy certain rights and protections, such as protection against dilution and the creation of certain reserved matters that required the approval of preferred shareholders.

70. Galaxy exerted influence over AlphaPoint in still other ways.  As a publicly traded company with investments in dozens of companies, Galaxy was able to tap into a network of professionals and industry players that could significantly help, or hurt, AlphaPoint's business.

71. Galaxy thus controlled AlphaPoint's board through a combination of its influential position as AlphaPoint's lead investor and sole preferred shareholder, its right to appoint and directly control a single board seat, and its veto power over the selection of "Independent Directors.".

72. Galaxy was thereby able to ensure that a majority of AlphaPoint's board consisted solely of persons who Galaxy had either directly selected or had agreed could serve in that position.

73.    The control exercised by Galaxy over AlphaPoint's board was, at the least, negative control. Through a combination of direct representation on AlphaPoint's board, influence over the selection of other directors, the covenants in their Series A-1 preferred shares, and their ability to withdraw support from AlphaPoint for future funding rounds, Galaxy was effectively able to block AlphaPoint from engaging in certain acts with which it disagreed.

74.    Accordingly, Galaxy's negative control over AlphaPoint gave rise to affiliation under the SBA Act and the PPP.

**Galaxy and AlphaPoint Conspire to Defraud the US Government's PPP Program**

75.    On March 5, 2020, AlphaPoint announced that it had raised a further $5.6 million in funding from Galaxy.  AlphaPoint had now raised more than $23 million dollars in total funding, $20 million of which had come from Galaxy.

76.    A month later, on or about April 3, 2020, the PPP was launched.  The PPP loan program promised relief to American small businesses from the economic impact of the COVID-19 pandemic.

77.    Despite having just raised millions of dollars from Galaxy a month prior, AlphaPoint embarked on a scheme to raise millions more from the federal government through PPP loans, supported by misrepresentations and/or omissions, which would ultimately be forgiven, leaving the American taxpayers on the hook.

78.    Galaxy's control over AlphaPoint's board of directors reveals both its knowledge of, and culpability for, this scheme.

79.    On information and belief, AlphaPoint applied for a PPP loan without ever having actually ratified the 2020 Amended Voting Agreement, which had been backdated in January 2023 as part of an effort to conceal Galaxy's control over AlphaPoint.

80.     However, even assuming AlphaPoint had ratified the 2020 Amended Voting Agreement on its effective date — April 21, 2020 — it did so in furtherance of a scheme to defraud the United States.

81.     The 2020 Amended Voting Agreement sought to circumvent the SBA's affiliation rules by removing Galaxy's negative control over AlphaPoint's board of directors.  On paper, it removed Galaxy's control.  In reality, Galaxy never lost any influence over AlphaPoint's board.

82.     *First,* the Amended Voting Agreement accomplished its goal by reducing the size of the board from seven (7) members to five (5).  The two eliminated members were Independent Directors whom Galaxy had been able to nominate and/or veto.  The end result of this change to AlphaPoint's board was that Galaxy no longer controlled a majority of the board since it now only had control and influence over two (2) out of five (5) board seats.  Galaxy thus appeared to have lost its control over AlphaPoint's board of directors. However, that simply was not the case.

83.     *Second,* the 2020 Amended Voting Agreement's express terms indicated that its very purpose was to facilitate AlphaPoint's application for an SBA loan.  It provided no other explanation for its changes, and its recitals expressly stated that the changes would be put into effect to facilitate AlphaPoint's application for a PPP loan.

84.     *Third,* the change to AlphaPoint's board composition was only temporary and was not *"irrevocable",* as required by SBA regulations.  Galaxy's loss of negative control over AlphaPoint's board would cease the moment a PPP loan was no longer contemplated.  This prevented AlphaPoint from qualifying for the exemption to the SBA's affiliation rules, which requires such change be "irrevocable".

85.     As stated in the 2020 Amended Voting Agreement, the change was automatically revoked the moment the PPP loan was no longer a concern.  The moment AlphaPoint's

application for a PPP loan was rejected, or the PPP loans had been repaid or forgiven, AlphaPoint's board would automatically revert to seven (7) members.

86.    Galaxy would then once again be able to: (A) exert its influence to re-appoint the Independent Directors whom it wanted on the board; (B) control four (4) of the seven (7) seats on AlphaPoint's board, in line with the 2018 Voting Rights Agreement; and (C) exert negative control over AlphaPoint's board.

87.    Galaxy never irrevocably ceded control over AlphaPoint's board of directors in the Amended Voting Agreement.  Though Galaxy lacked negative control on paper, this was only temporary, it still controlled a board seat and the rest of the board knew that it would be keeping a watchful eye on every decision it made while AlphaPoint pursued free money from the US government.

**AlphaPoint received $3.66 million in PPP Loans**

88.    AlphaPoint applied for and received two PPP loans totaling more than $3,663,268, careful to keep each loan below the SBA and the Treasury Department's two-million-dollar threshold that would trigger an automatic audit upon applying to have them forgiven.

89.    On or about April 27, 2020, AlphaPoint was approved for a PPP loan of $1,831,814.00.

90.    It is unclear when exactly AlphaPoint submitted its application for its 2020 PPP loan, but its application was approved less than one week after the effective date of the 2020 Amended Voting Agreement.

91.     The day after AlphaPoint's 2020 PPP loan was approved, on April 28, the media began reporting on scandals related to large businesses taking advantage of PPP loans, which had been intended exclusively for small businesses.

92.     For example, the Los Angeles Lakers had applied for and received more than $4,000,000 in PPP funds, which prompted the media response. Treasury Secretary Mnuchin announced that loans greater than $2,000,000 would face an audit from Treasury and the SBA if and when they applied for forgiveness. The Lakers and many other businesses thereafter opted to return their PPP funds.

93.     That same day, April 28, 2020, the SBA clarified in the Federal Register what many already knew — that the SBA's affiliation rules applied to PPP loans, and that hedge funds and private equity were *ineligible*.

94.     Amazingly, instead of returning the funds, AlphaPoint applied for another loan and then applied to have both loans forgiven.

95.     On or about March 20, 2021, AlphaPoint was approved for an additional $1,831,814.00.

96.     On or about June 14, 2022, AlphaPoint's 2020 PPP loan was forgiven in part. On information and belief, AlphaPoint did not provide the SBA with the Redacted AlphaPoint documents referenced herein, and the SBA did not commence an audit because the sum being forgiven was less than $2,000,000.

97.     Upon information and belief, AlphaPoint's 2021 PPP loan has not yet been forgiven.

98.     It is noteworthy that AlphaPoint's 2020 and 2021 PPP loans were for identical sums of money, yet their 2021 PPP loan was earmarked to support more than three times as many employees.

99.     Whereas AlphaPoint informed the SBA that their 2020 PPP loan would be used to support 30 jobs, they informed the SBA that their 2021 PPP loan, of the same amount, now would support 99.

100.    On information and belief, AlphaPoint had simply picked the sum of $1,831,814 out of thin air and it did not represent actual payroll costs.  Despite listing more than three times as many employees on its 2021 PPP loan application, AlphaPoint sought the same amount of funds so as to remain below Secretary Mnuchin's $2,000,000 audit threshold.

**Galaxy's Record Profits and AlphaPoint's Success in the Crypto Bull Run of 2021**

101.    During the crypto bull run of 2021, Galaxy experienced record profits. Its net income increased from nearly $110M in September 30, 2021[5] to over $400M by December 31, 2021,[6] its assets jumped from $681M to $888M,[7] and its total shareholders' equity increased to $786M—an increase of over $200M in just three months.[8]

102.    AlphaPoint was also experiencing similar success. With an absolute revenue growth rate of nearly 1,700%, AlphaPoint ranked 34th on the Financial Times' list of fastest-growing companies in the Americas in 2021.[9]

---

[5] *Galaxy Digital Holdings Ltd. Condensed Consolidated Interim Financial Statements For the Three and Nine Months Ended September 30, 2021 and 2020 (unaudited)*,
https://s201.q4cdn.com/407453138/files/doc_financials/2021/q3/GDH-Ltd-Financial-Statements-9_30_2021.pdf
(hereinafter "Galaxy September 2021 Financials").
[6] *Galaxy Digital Holdings Ltd. Condensed Consolidated Interim Financial Statements For the Years Ended December 31, 2021 and 2020 (audited)*,
https://s201.q4cdn.com/407453138/files/doc_financials/2021/q4/GDH-Ltd-Financial-Statements-12.31.21.pdf
(hereinafter "Galaxy December 2021 Financials").
[7] Galaxy September 2021 Financials; Galaxy December 2021 Financials.
[8] Galaxy September 2021 Financials; Galaxy December 2021 Financials.
[9] Maxine Kelly, *FT ranking: The Americas' Fastest-Growing Companies 2021*, Financial Times (Apr. 13, 2021),
https://www.ft.com/americas-fastest-growing-companies-2021.

103.    Interestingly enough, the Financial Times required an application for consideration, which means AlphaPoint was applying to the media for recognition as one of the hemisphere's most successful companies, while at the same time applying to the United States government for aid, claiming that it could not afford to maintain its workforce without receiving over $3.5 million in cash injections from the US taxpayer. Hardly the earmarks of an entity being considered for "most successful companies."

**Galaxy's Shifting Position on PPP Loans**

104.    During the summer of 2020, at the height of the Covid-19 pandemic, controversy emerged when an article published by CoinDesk[10] revealed that more than 45 digital asset companies had applied for and received PPP loans.

105.    Numerous critics voiced their disdain for these companies, arguing that they did not need the loans and were depriving them of funds that were earmarked for businesses that actually needed them, as opposed to venture-funded companies such as AlphaPoint.[11]

106.    Responding to the critics, Galaxy CEO Mike Novogratz took to Twitter to voice support for businesses who applied for and were granted PPP loans.  Referring to the PPP loans, Novogratz stated that businesses can use "free capital", regardless of whether they can justify that it was "necessary".  He thus dismissed the critics on Twitter who stated that there were those who did not need the money but received it (such as Tron), while many companies in need did not.

[10] https://www.coindesk.com/business/2020/07/06/consensys-polychain-tron-ciphertrace-blockchain-startups-got-30m-in-us-ppp-bailout-loans/ .
[11] https://u.today/mike-novogratz-supports-dlt-companies-who-took-feds-ppp-usd-standing-against-crypto-influencers



107.    However, by December 2022 Novogratz's opinion had changed.    By then Congress had already held hearings into abuse of the PPP program and companies were coming under scrutiny for seeking forgiveness for such loans.    Novogratz stated that "the abuse of the PPP Covid loans really makes me sad" and that "too many Americans used the chaos to loot our coffers."



108.    Novogratz' statement that the PPP loans were akin to tax-free "equity injections" stands in contrast to AlphaPoint's own statement on the matter.    In a February 4, 2022 email to

BNAS, AlphaPoint stated that "[t]he PPP loan program was in no way a fundraising event, such as an equity financing would have been."

109.    And while Novogratz stated that he was glad Galaxy "passed" on applying for a PPP loan, AlphaPoint, a Galaxy portfolio company, did not.



110.    Whether Novogratz had personal knowledge of AlphaPoint's PPP loan or not is immaterial.  A Galaxy employee occupied a seat on AlphaPoint's board of directors, and Galaxy knew or should have known the portfolio company under its control had applied for and received PPP funds via misrepresentations and omissions.

### AlphaPoint is Merely One Galaxy Portfolio Company

111.    Upon information and belief, AlphaPoint is merely one of a number of Galaxy-controlled portfolio companies that sought and received PPP loans in the same, or similar manner, as AlphaPoint.

112.    Upon information and belief, the actions of AlphaPoint, as described herein, were adopted and instituted by other Galaxy portfolio companies to defraud the US government and

the US taxpayers out of millions of dollars that were earmarked to help small businesses that actually needed the funds, not companies controlled by an entity with nearly $1 billion in shareholder equity, such as Galaxy.

113.    While the exact names of the Galaxy portfolio companies that adopted a similar fraudulent scheme as AlphaPoint are not currently known, discovery in this case will, upon information and belief, lead to the identification of additional entities that were a part of Galaxy's PPP fraud scheme.

## COUNT I

### False Claims Act 31 U.S.C. § 3729(a)(1)(a)
### (Against Defendant AlphaPoint)

114.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

115.    By virtue of the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

## COUNT II

### False Claims Act 31 U.S.C. § 3729(a)(1)(b)
### (Against Defendant AlphaPoint)

116.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

117.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b).

**COUNT III**

**False Claims Act 31 U.S.C. § 3729(a)(1)(a)**
**(Against Defendant Galaxy)**

118.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

119.    By virtue of the acts described above, Defendant Galaxy operated a scheme whereby its portfolio companies knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

**COUNT IV**

**False Claims Act 31 U.S.C. § 3729(a)(1)(b)**
**(Against Defendant Galaxy)**

120.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

121.    By virtue of the acts described above, Defendant Galaxy operated a scheme whereby its portfolio companies knowingly presented, or caused to be made or used, false records and statements, to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b).

**PRAYER FOR RELIEF**

WHEREFORE, the Relator, on behalf of itself and the United States of America, prays:

A.    That this Court enter judgment against Defendant AlphaPoint under Counts I and II in an amount equal to three times the amount of damages the United States has sustained as a result of  Defendant's actions in violating the Federal False Claims Act, believed to be in excess of $10,900,000, plus all applicable federal statutory penalties;

24

B.      That this Court enter judgment against Defendant Galaxy under Counts III and IV in an amount equal to three times the amount of damages the United States has sustained as a result of the actions of Defendant Galaxy's other portfolio companies in violating the Federal False Claims Act, amount to be proven at trial, plus all applicable federal statutory penalties;

C.      That the Relator be awarded all costs incurred in bringing this action, including, but not limited to, reasonable attorneys' fees and expenses;

D.      That in the event the United States intervenes at the time this action is unsealed and proceeds with this action, that Relator be awarded an amount of between 15% and 25% of the proceeds of this action or settlement of the claims in Counts I-IV.

E.      That in the event the United States does not intervene as set forth above, the Plaintiff/Relator be awarded an amount between 25% and 30% of the proceeds of this action or settlement of the claims in Counts I-IV; and

F.      That the United States and Relator receive all other relief, both at law and equity, this Court deems just and proper.

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

## DEMAND FOR JURY TRIAL

Relator demands a trial by jury on all issues of triable fact in the foregoing complaint.

Dated:  May 24, 2023

Respectfully submitted,

By: _Daniel Kelman_

Daniel  J. Kelman
Michael D. Handelsman
KELMAN PLLC
daniel@kelman.law
mike@kelman.law 1501
Broadway
12th Floor, #2972 New
York, NY 10036 Phone:
(212) 380-3818

*Attorneys for Relator*